# EXHIBIT B

matchroom.

## CO-PROMOTION AGREEMENT

THIS AGREEMENT is made on January 14, 2022 between (1) **Matchroom Boxing USA LLC ("Matchroom")**, a limited liability company formed and registered in the state of Delaware, with its registered office at One World Trade, Floor 72, New York, NY, 10007, USA; and (2) **MVP Management LLC** ("MVP or Promoter"), a Puerto Rico limited liability company with its registered office at 1064 Ponce De Leon Avenue, Suite 507, San Juan, Puerto Rico 00907 (hereafter, each a "**Party**" and collectively, the "**Parties**"),

For the professional boxing services of Amanda Serrano (the "Boxer").

**1.      Recitals**

1.1      This agreement is ancillary to a provision of services agreement entered into by Matchroom and the Real Deal Entertainment Corp. ("Real Deal") dated on or around the date of this agreement (the "Bout Agreement") pursuant to which the Boxer will engage in a 10 round lightweight contest against Katie Taylor (the "Opponent") for the World Boxing Council ("WBC"), World Boxing Association ("WBA"), World Boxing Organisation ("WBO") and International Boxing Federation ("IBF") and Ring Magazine World Lightweight Championships on April 30, 2022 (the "Date") at Madison Square Garden, New York, New York or such other venue to be selected by Matchroom and subject to the approval of MVP (the "Venue") plus such other undercard bouts to be selected by Matchroom in consultation with MVP (collectively, the "Event").

1.2      For the avoidance of doubt, the Venue shall be understood to mean the Madison Square Garden main arena and not the Hulu Theater, any change in the Venue location or the Date shall be subject to the approval of MVP. Matchroom agrees to provide MVP with a copy of the draft agreement with the Venue and shall reasonably consult with MVP with respect to the finalization of such agreement, including, without limitation, scaling of the Venue and ticket prices for the Event. MVP shall also be provided with such documentation as is necessary to verify ticket sales to the Event. MVP and Matchroom shall reasonably agree on the amount of complimentary as are granted to Matchroom and MVP, ensuring in any case that contractual obligations to Event broadcasters, undercard fighters and sponsors are covered. In addition, MVP shall have the right to purchase two hundred and fifty (250) tickets at face value to the Event prior to any tickets being made available to the public, including, without limitation, prior to tickets being made available pursuant any pre-sale events. Matchroom also agrees to provide MVP with one (1) complimentary suite for MVP's use during the Event.

1.3      MVP shall be provided with ten (10) all access credentials to the Event for use by MVP's executives and employees. In addition, Matchroom agrees to furnish to MVP: roundtrip air transportation for two (2) persons (business class) to the Venue and two (2) hotel suites for the period from the Tuesday before and to and including the day of the Bout; which airline tickets and hotel rooms shall be separate and apart from any airline tickets or hotel rooms provided to Boxer pursuant to the Bout Agreement. In addition, with respect to the press conferences that are scheduled to publicly announce the Event, MVP shall be provided (i) roundtrip air transportation for one (1) person (business class) to the city of each press conference, (ii) one (1) hotel suite, and (iii) a mutually agreed upon number of tickets to such press conferences; provided that Matchroom acknowledges and agrees that if Jake Paul determines to attend such press conferences, MVP shall be provided with an additional business class flight (two (2) business class flights in total) and an additional hotel suite (two (2) hotel suites in total) for each such press conference.

1.4      Notwithstanding anything else contained herein, the parties agree that the Date of the Bout shall be April 30, 2022 or such other date as mutually agreed upon with MVP and Real Deal; provided that if such Date is not confirmed by Matchroom by January 31, 2022, MVP/Real Deal shall have the right but not the obligation to terminate this Agreement in its sole discretion (subject to Matchroom's rights with respect to rescheduling in the event of force majeure under the Bout Agreement).

1.5      For the avoidance of doubt, this Agreement shall cease to exist in the event that the Bout does not take place pursuant to the terms of the Bout Agreement or if the Bout Agreement lapses or terminates for any reason or in accordance with the terms therein.

1.6      All provisions of the Bout Agreement shall apply as if they were set out in this Agreement save as otherwise stated herein. In the event of any inconsistency between the provisions of this Agreement and the Bout Agreement, the Bout Agreement shall control to the extent necessary to resolve such inconsistency. The parties agree that should a Rematch Bout take place pursuant to the Bout Agreement, the Rematch Bout shall be governed by Clause 7 of the Bout Agreement and no additional financial consideration or revenue upside shall be payable under this Agreement but MVP shall nonetheless provide the same, publicity, marketing and other services as outlined herein for the Rematch Bout and clause 1.3 above shall also apply.

1.7      All capitalized terms are as defined in the Bout Agreement unless otherwise stated.

1.8      The Parties agree that Matchroom shall be solely responsible at its sole cost and expense for all production elements of the Event and for the broadcast delivery of the Event, as well as all other costs and expenses associated with the Event, including, without limitation, any and all sanctioning fees (save for those payable by the Boxer), security costs, insurance policies (save for any policies taken out independently by the Boxer), purses and expenses of other fighters participating in the Event and other fees and expenses incurred in connection with the promotion of the Event. MVP shall be solely responsible for providing the services of Boxer and for the co-promotion services expressly set forth herein.

1.9      Matchroom agrees to use commercially reasonable efforts to cause DAZN to distribute the Event via pay-per-view in addition to distributing the Bout on DAZN's subscription service, subject in all respects to the availability of the United States and Canadian cable and satellite distributors to offer the Bout for pay-per-view purchase. For the avoidance of doubt, DAZN shall retain any and all revenues from PPV sales (as well as Worldwide Rights generally).

**2.      Fighter Services**

2.1      In consideration for the Boxer participating in the Bout and for MVP furnishing the services of Boxer and providing the co-promotion services as set forth herein, Matchroom shall remit to the Promoter a sum equivalent to 50% (fifty percent) of:

(a)      the total Net Live Gate Revenue due to Matchroom for the Event above the sum of $500,000 (Five Hundred Thousand US Dollars) (if applicable) ("Gate Bonus"). "**Net Live Gate Revenue**" shall mean all proceeds from the sale of tickets to the Event minus, as applicable, any license fee payable to the Venue, ticketing fees, service charges, taxes, credit card charges and returns. For clarity, the Parties understand and agree that Matchroom shall retain the first $500,000 (Five Hundred Thousand US Dollars) of Net Live Gate Revenue. Matchroom agrees to provide MVP with a draft pro forma promptly upon receipt from the Venue. Upon conclusion of the Bout, Matchroom agrees that it shall provide Promoter with a preliminary settlement statement from the Venue and the parties further agree to hold a final settlement within two (2) business days of the conclusion of the Event (subject to receipt of the necessary documentation from the Venue); and

(b)      the total net sponsorship revenue (i.e., less all applicable sponsorship fees, commissions, and other expenses) for the Event above the sum of $200,000 (Two Hundred Thousand US Dollars) (if applicable) ("Sponsor Bonus"). For clarity, the Parties understand and agree that Matchroom shall retain the first $200,000 (Two Hundred Thousand US Dollars) of net sponsorship revenue.

(c)      Matchroom represents, warrants and covenants that as of the date hereof (i) MVP shall not be precluded from selling sponsorships for the Event in any sponsorship category save for to competitors of JD Sports (i.e. sports and fashion apparel and retail), and (ii) Matchroom has no contractual obligations that would otherwise limit the ability of MVP to sell sponsorships for the Event. Matchroom represents that JD Sports has the following in-venue assets: (i) one neutral corner of the ring mat (two secondary positions on the outside edge of the ring mat), (ii) one ring rope on the ring, and (iii) one neutral corner pad on the ring. The Parties also understand and agree that DAZN shall be granted ring positions commensurate with previous bouts and industry standard for the host broadcaster.

(d)      The Parties understand that Matchroom shall also sell sponsorship to the Event and have reasonable discretion and final say over which sponsorship deals are ultimately approved provided such decisions are taken rationally and with a view to revenue maximization. Notwithstanding the immediately preceding sentence, the Parties agree that Matchroom and MVP shall consult with each other prior to soliciting any sponsorship opportunities, and Matchroom shall use its best endeavors to procure that DAZN consult with Matchroom and MVP prior to soliciting any sponsorship opportunities such that DAZN, Matchroom and MVP shall (i) be in mutual agreement with respect to identifying and soliciting any sponsorship opportunities for the Event, and (ii) agree in advance with respect to the terms and assets to be offered in connection with any sponsorship opportunities for the Event.

2.2      The Gate Bonus and Sponsor Bonus shall be payable within two (2) business days of receipt by Matchroom of a full event audit from the Venue (which Matchroom shall share with MVP) and ticketing proceeds from the Venue in cleared funds.

2.3      In the event that no material live gate or sponsorship revenue is possible (despite the best efforts of the Parties), Matchroom shall have the right but not the obligation to terminate the Agreement.

2.4      Other than the Purse due to the Boxer pursuant to the Bout Agreement and the above payments outlined in clause 2.1 (if applicable), Matchroom shall have no further financial obligation to the Promoter or to the Boxer directly or indirectly related to the Bout.

**3.      Sponsorship and Marketing**

3.1      The Parties agree that Matchroom shall co-promote Boxer, alongside MVP, for the Bout and, except as otherwise provided herein, Matchroom shall have sole control over all promotional decisions including, but not limited to, ticketing and advertising. The Bout shall be billed as "Taylor v. Serrano" and presented as "Eddie Hearn for Matchroom Boxing and Jake Paul and Nakisa Bidarian for Most Valuable Promotions proudly present" or "Matchroom Boxing and Most Valuable Promotions proudly present" in all billing. The Opponent shall be granted all champions privileges including being announced second, walking to the ring second, being in the home corner, and first choice of locker room;. Matchroom shall include Promoter's logo on all advertising and marketing material in the same size and prominence as Matchroom's logo. In addition, Promoter shall be (i) allowed to place Promoter's logo on the ring mat (subject to availability and not greater prominence than Matchroom in any case), (ii) afforded the same amount of branding in the Venue as Matchroom, including, without limitation, placement of Promoter's logo corners, ring ropes, in arena signage, banner on lighting truss, etc. (should the Matchroom logo be included), but excluding various generic semi-permanent assets that accompany the Matchroom global operations (i.e., including but not limited to tailored security barrier covers, ring skirting covers and other items and staff uniforms), and (iii) allowed to choose, subject to Matchroom's reasonable approval, and feature two (2) ring card girls (subject to availability) to be utilized for the Event, which ring card girls shall be co-branded with MVP and Matchroom logos and/or attire.

3.2      In addition, Matchroom shall pay to the Promoter 20% (Twenty Percent) commission of the total net revenue generated directly by the Promoter from sponsorship monies received as a direct consequence of the Promoter's efforts (the "Sponsor Fee"). The Sponsor Fee for any sponsors generated by MVP shall be mutually agreed upon between Matchroom and MVP and less any governmental ordered deductions, if applicable, including but not limited to any withholding tax. For clarity, the Sponsor Bonus shall be calculated by reference to any *net* amounts received from sponsors procured by Promoter under this clause. For renewal sponsorships, modifications, options, extensions, additional contracts et. al. (collectively, "Renewals"), the same terms hereunder shall apply and MVP shall be due the same commission on any such Renewals. Any such sponsor accepted hereunder shall be

deemed procured for the benefit of Matchroom by MVP, and accordingly, MVP will be due a commission for any and all future deals between Matchroom and such sponsors for a period of one year from the date of the Event.

**4.      Publicity, Public Relations and Advertising**

4.1     MVP shall fully cooperate and assist in the advertising, publicity, and promotion of the Bout. Such obligations will include:

(a)     up to 5 (five) posts on MVP's social media pages promoting the Bout, including broadcast details and ticket sales, wording for such posts as reasonably required by Matchroom;

(b)     sharing up to five (5) Matchroom social media posts (and videos) relating to the Bout on MVP's social media platforms;

(c)     providing Matchroom, subject to reasonable advance notice, with reasonable access to Jake Paul during the build-up to the Bout to conduct TV and other media interviews;

(d)     Jake Paul shall use commercially reasonable efforts to attend all fight week promotional events and the Event; and

(e)     The Parties acknowledge and agree that any requested social media posts provided to Jake Paul shall also include MVP logos and branding.

4.2     Jake Paul shall use commercially reasonable efforts to participate in such other live social media activities relating to the publicity and promotion of the Bout (which may include but shall not be limited to, appearing at a reasonable number of telephone or zoom press conferences, interviews and other promotional activities) as Matchroom may reasonably request; provided that Matchroom shall provide reasonable advance notice to Jake Paul prior to any such activities.

4.3     Matchroom or DAZN, as the case may be, shall produce at its sole cost and its expense "Face 2 Face brought to you by MVP, Matchroom and DAZN" to be hosted by Ariel Helwani or a DAZN host if Ariel Helwani is not available (e.g., Taylor vs Serrano, Hearn vs Paul) at a time and place mutually agreed upon with MVP. In addition, Matchroom agrees that the distribution of any such "Face 2 Face" segments shall be mutually agreed upon with MVP and DAZN. The Parties agree that the "Face 2 Face brought to you by MVP, Matchroom and DAZN" segments shall include MVP, DAZN and Matchroom branding (e.g., "bugs," etc.), as well as "in association with" or "brought to you by" credits for DAZN, MVP and Matchroom, as reasonably agreed upon by the Parties.

4.4     Matchroom agrees that any and all uses of the name, image and likeness of MVP and its executives, including, without limitation, Jake Paul, shall be subject in all respects to MVP's prior approval. In addition, Matchroom agrees that any and all announcements issued by Matchroom regarding the Event and any Rematch Bout shall require the prior approval of MVP (such approval not to be unreasonably withheld, conditioned or delayed).

**5.      Anti-Bribery and Compliance with Applicable Law**

The Promoter represents and warrants to Matchroom on behalf of itself and its employees, agents, representatives, affiliates and any person or entity who performs services on behalf of Promoter that it is in full compliance with applicable laws, regulation and sanctions regulation, it has not, prior to the date of this Agreement, bribed or attempted to bribe any party in order to secure any business from the other party, it is familiar with and will abide by the anti-bribery and anti-money laundering laws in all of the countries in which it is incorporated or established and in which it does business and it will not take or knowingly permit any action to be taken that would cause Matchroom to be in violation of any anti-bribery or anti-money laundering laws, including but not limited to, the Bribery Act 2010 and the US Foreign Corrupt Practices Act, as they may be amended from time to time.

**6.      Non-Disparagement.**

Each Party (including Matchroom, Boxer and MVP) agrees not to make, or induce or assist others in making, any negative, disparaging, detrimental, or derogatory remarks or statements (written, oral, telephonic, electronic, on social media, or by any other method) about another Party, its business operations, business practices, reputation, executives, including without limitation, Eddie Hearn, Jake Paul, or any employees of MVP/Matchroom. Parties understands and agree that this paragraph is a material provision of the Agreement and the parties agree that a breach of this paragraph shall cause immediate and irreparable harm to Parties for which there is no adequate remedy at law. For the avoidance of doubt, the Parties understand and agree that nothing in this paragraph shall prevent the Parties "hyping" the Bout and engaging in the normal back and forth that is traditional as part of a boxing promotion.

**7.      Governing Law**

This Agreement shall be governed and construed by the substantive laws of the State of New York and without regard to New York choice of law principles or conflicts of law principles.

**8.      Dispute Resolution**

Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate (collectively, a "Dispute"), shall be submitted to final and binding arbitration at the New York, NY office of JAMS, or its

3

successor ("JAMS"), pursuant to the procedure set forth below. The arbitration will be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, in effect at the time the request for arbitration is made (the "Arbitration Rules"). The parties agree that a Dispute will include the determination of the scope or applicability of this agreement to arbitrate and the arbitrability of the Dispute, including but not limited to any claim of waiver. The arbitration will be conducted before a single neutral arbitrator appointed in accordance with the Arbitration Rules. Unless the parties agree otherwise, the neutral arbitrator will be a former or retired judge or justice of any New York state or federal court with substantial experience in matters involving the entertainment industry, who is affiliated with JAMS. The arbitrator will follow New York law in adjudicating the Dispute. The arbitrator will provide a detailed written statement of decision which will be part of the arbitration award. The arbitrator's award will be final and binding except to the extent that limited judicial review is permitted by applicable law. The parties are to share the arbitration costs and the arbitrator's fees equally, provided that the prevailing party in any arbitration as determined by the arbitrator shall be entitled to recover its costs and expenses of arbitration, including without limitation, reasonable attorneys' fees and costs. The parties waive the right to seek punitive damages and the arbitrator will have no authority to award such damages. All arbitration proceedings will be closed to the public and confidential, and all records relating thereto will be permanently sealed. Neither the parties nor the arbitrator will disclose the existence, content, testimony, evidence or results of the arbitration, except as necessary to comply with legal, statutory or regulatory requirements. Before making any such disclosure, a party will give written notice to all other parties and will afford such parties a reasonable opportunity to protect their interests. If either party refuses to perform any or all of its obligations under the final arbitration award within thirty days of such award being rendered, then the other party may confirm or enforce the final award in any court of competent jurisdiction in New York County. All parties consent to the personal jurisdiction of the state and federal courts located in New York County for purposes of confirming or enforcing any arbitration award. Judgment on the award may be entered in any court having competent jurisdiction.

**9.      Indemnification**

9.1      Matchroom agrees to indemnify, defend and hold harmless the MVP and its officers, employees, representatives and agents, from and against any suits, claims, actions, proceedings, expenses (including reasonable attorneys' fees) and damages arising from any actual or claimed breach of any representations, warranties, covenants, or obligations of Matchroom herein.

9.2      MVP agrees to indemnify, defend and hold harmless the Matchroom and its officers, employees, representatives and agents, from and against any suits, claims, actions, proceedings, expenses (including reasonable attorneys' fees) and damages arising from any actual or claimed breach of any representations, warranties, covenants, or obligations of MVP herein.

**The foregoing completely and accurately sets forth the understanding between us.**

FOR AND ON BEHALF OF MVP MANAGEMENT, LLC    FOR AND ON BEHALF OF MATCHROOM BOXING USA LLC

Executed by:-                                    Executed by:-

*Nakisa Bidarian*

…2B969810EE9140A……………………………    …………………………………………………

**Nakisa Bidarian**                                    **Frank Smith, CEO**

5