

275 Madison Ave., 35th FL
New York, NY 10016
selwlaw.com
646.863.1883 P
646.365.3119 F

May 22, 2023

**VIA ELECTRONIC FILING**
Honorable Paul G. Gardephe
United States District Court
Southern District of New York
40 Foley Square, Room 2204
New York, NY 10007

      **Re: Matchroom Boxing Limited, et al v. Jake Paul; Case No. 1:22-cv-08178-PGG**

Your Honor:

Our office submits this letter on behalf of Plaintiffs Matchroom Boxing Limited ("Matchroom") and Eddie Hearn ("Hearn"), and Plaintiff-Intervenor Glenn Feldman ("Feldman")(collectively, "Plaintiffs"), in response to Defendant Jake Paul's ("Defendant") updated pre-motion letter pursuant to Rule IV(A) of Your Honor's Individual Rules of Practice. [Doc. 47] (the "Letter"). Defendant requests permission to file a motion for (i) dismissal pursuant to Fed. R. Civ. P. ("FRCP") 12(b)(2); (ii) dismissal pursuant to FRCP 12(b)(3); and (iii) dismissal of Matchroom's claims because Defendant contends Matchroom is not authorized to maintain a lawsuit in this Court. *Id.* Defendant's claims fail as a matter of law and Defendant's request should be denied.

**Nature of the Action**

On September 20, 2022, Defendant falsely accused Plaintiffs of bribery and corruption in the sport of professional boxing, stating, without any evidence, that Feldman was "[c]learly…getting paid money by Matchroom." [Doc. 6, at ¶¶ 7, 31, 33].[1] Defendant himself characterized his offensive remarks as "a bold statement and an accusation that [he] d[id]n't take lightly," and asserted further that "it's just so blatantly obvious and they're not even trying to hide it." *Id.*, at ¶¶ 7, 34. The defamatory statements focused on two boxing matches: (i) a bout between Katie Taylor ("Taylor") and Amanda Serrano ("Serrano")("Taylor-Serrano") on April 30, 2022 in New York City's Madison Square Garden ("MSG"); and (ii) a bout between Oleksandr Usyk ("Uskyk") and Anthony Joshua ("Joshua") ("Usyk-Joshua"), in Saudi Arabia on August 20, 2022, one month before Defendant's false statements were published worldwide. *Id.*, at ¶ 6, 32.

It is abundantly clear that Defendant's baseless remarks, with regard to both bouts, were borne out of his anger and frustration over Serrano, who is promoted by Defendant's boxing promotional company, Most Valuable Promotions, LLC ("MVP Promotions"), being defeated by Taylor, who is promoted by Matchroom, during an event co-promoted by Matchroom's New York-based subsidiary, Matchroom Boxing USA, LLC ("MBUSA") and another entity named MVP Management LLC ("MVP Management," and collectively with MVP Promotions, "MVP"). *Id.*, at

---

[1] The allegations in Feldman's Complaint, [Doc. 23], mirror those in Matchroom and Hearn's Complaint, [Doc. 6], and thus, for the sake of brevity, Plaintiffs cite only to Matchroom and Hearn's Complaint herein.



¶¶ 25, 52. MVP Management is a holding company for the ownership of MVP, and like MVP Promotions, is owned and controlled by Defendant and his business partner, Nakisa Bidarian ("Bidarian").[2] The fact that Paul's defamatory remarks stemmed directly from the loss of Serrano––one of his company's most successful fighters, and one for whom he personally manages and/or advises—is apparent from the statements themselves, which began with Defendant proclaiming "I still think Amanda Serrano won the fight." [Doc. 17, at p. 2].

Rather than accept the decision of the boxing judges that officiated Taylor-Serrano, one of which was Feldman—a decision that was widely supported by boxing media specialists—Defendant actively and intentionally sought to capitalize on his massive social media following to attack Plaintiffs' reputations and standing in the boxing profession by directly accusing Plaintiffs of the crimes of bribery and corruption during an interview he admittedly knew would be broadcast worldwide. Defendant had full knowledge of boxing's long history of scandal and corruption, and in fact, sought to insert a belief in the boxing community that Plaintiffs fall squarely into that mold of corruption and illegal conduct. Due to Defendant's vast social media following, and the significant public attention his headline-worthy remarks garner, his false statements regarding Plaintiffs were immediately published and re-published worldwide by news media outlets and Internet publications, including within this District. [Doc. 6, at ¶¶ 40-46, 60, 66].

Notably, in connection with Taylor-Serrano, MBUSA and MVP entered into a co-promotion agreement dated January 14, 2022 (the "Agreement"), which was executed by Bidarian on behalf of MVP. [Doc. 17-2]. As Matchroom's COO Shaun Palmer ("Palmer") and Hearn both testified––testimony that directly corroborates Defendant's own testimony, *see* note 2—Defendant was actively involved in the negotiations, and announced and promoted the fight on his social media pages and elsewhere immediately following the Agreement's execution. The Agreement was governed by New York law, and the parties to the Agreement, which obligated Defendant to personally carry out expressed obligations and referenced Defendant by name ten separate times, consented to the jurisdiction of the state and federal courts of New York with regard to disputes arising out of the Agreement.

**Venue is Proper in this Judicial District**

To determine proper venue, the Court is to "view all facts in the light most favorable to the plaintiff [and]…accept the facts alleged in the complaint and construe all reasonable inferences in the plaintiff's favor." *Ne. Landscape & Masonry Assocs., Inc. v. State of Connecticut Dep't of Lab.*, No. 14-CV-9104 (KMK), 2015 WL 8492755, at *2 (S.D.N.Y. Dec. 10, 2015) (citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007). When a substantial part of the alleged acts or omissions giving rise to the plaintiff's claim occurred within the judicial district in which the plaintiff brought said claims, venue is deemed proper. *Ne. Landscape,* at *2 (citing 28 U.S.C. § 1391(b)(2)). Courts also look at the "locus of the harm suffered [by the plaintiff] as a factor." *Id.*, at *3.

---

[2] Defendant testified during a deposition taken in this matter regarding jurisdictional discovery that he is a 50% shareholder and authorized agent of both MVP Promotions and MVP Management, and has the authority to bind MVP legally and contractually. Defendant further testified that himself and Bidarian both execute contracts on behalf of MVP, but that they consult with, and get approval from, each other prior to doing so.



Defendant argues that venue is improper merely because Defendant contends that "the venue analysis 'must focus on where the defendant's acts or omissions occurred'" and Defendant was not physically present in New York while making the defamatory statements. These contentions contradict well-settled precedent, which unambiguously states that the proper inquiry assesses where "a substantial part of the acts and omissions *giving rise to the plaintiff's claim* occurred." *See Ne. Landscape* (emphasis added). Considering the indisputable facts that Defendant's statements. *i.e*., the act or acts giving rise to Plaintiffs' claims, were conceived from his animosity towards Plaintiffs due to Serrano's loss to Taylor, and Taylor-Serrano occurred within this District, pursuant to the Agreement, through which Defendant and his company provided Serrano's services in this District, unequivocally a substantial part of the acts giving rise to Plaintiffs' claims against Defendant occurred within this District. Thus, venue is proper here.

Plaintiffs allege in their Complaints that "[v]enue is proper in this district pursuant to 28 U.S.C. § 1391, as Defendant's defamatory statements reached this [] District," and "Defendant has minimum contacts with this District due to, for example, his co-promotion of the Taylor-Serrano fight, which was held at [MSG]." [Doc. 6, at ¶ 20]. Plaintiffs further allege that "Defendant's motivations for his [] baseless, and accusatory statements are not difficult to discern," *i.e*., Defendant's disagreement with the result of Taylor-Serrano. *Id*., at ¶ 52. A such, Defendant falsely asserts that "[t]he Complaint fails to allege that a substantial part of the events or omissions giving rise to the claims occurred in this District." Letter, at p. 2. Plaintiffs also allege that the false statements caused them "economic [] and reputational harm" within this District. *Id.*, at ¶ 63.

The cases Defendant relies upon in the Letter are unavailing. In *Prospect Cap. Corp. v. Bender*, No. 09 CIV. 826 (HB), 2009 WL 4907121 (S.D.N.Y. Dec. 21, 2009), venue was improper because the *sole* contention was that plaintiff maintained a principal office in this district, while in *Greenblatt v. Gluck*, 265 F. Supp. 2d 346, 350 (S.D.N.Y. 2003), venue was improper where the plaintiff simply claimed that "his New York business was somehow peripherally affected by the alleged torts," which the Court found "did not rise to the level of significance [] required by § 1391 (a)(2), *Greenblatt*, at 352. As summarized herein and detailed more fully in the Complaints, in this case Defendant maintains substantial contacts with New York, and in fact agreed in writing to have this forum be the proper venue for any claims related to Taylor-Serrano. Taken together, Defendant's request for dismissal on the grounds of improper venue is baseless.

**This Court Has Personal Jurisdiction Over Defendant[3]**

NY CPLR § 302(a)(1) is clear that personal jurisdiction over a non-domiciliary, such as Defendant, can be found when the non-domiciliary defendant "transacts business" or "purposefully avails himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws," with the key inquiry being whether the defendant "should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242–43 (2d Cir. 2007). Importantly, as it relates to this case, New York courts have outright abandoned the fiduciary shield doctrine, and agree that personal jurisdiction can be found "over a corporate

---

[3] On the issue of personal jurisdiction, Defendant's arguments in his Letter essentially mirror those set forth in Defendant's original letter motion for a pre-motion conference filed on November 28, 2022. [Doc. 16]. Thus, in addition to the arguments made herein, Plaintiffs incorporate by reference the arguments set forth in Plaintiffs' response to Defendant's original letter motion, which was filed with this Court on December 1, 2022. [Doc. 17].



officer…based upon his contacts in New York, even if his activities were performed solely in his corporate capacity." *Giannetta v. Johnson*, No. 20 CIV. 9016 (PAE), 2021 WL 2593305, at *10 (S.D.N.Y. June 24, 2021). The second inquiry in the personal jurisdiction assessment turns on whether there exists an affiliation between the defendant's activities within the forum and the underlying controversy. *Giannetta*, at *5; *see also Talbot v. Johnson Newspaper Corp.*, 522 N.E.2d 1027, 1028 (N.Y. 1988). Ultimately, however, New York courts are permitted to exercise jurisdiction "over any non-domiciliary…who in person or through an agent…contracts anywhere to supply goods or services within the state." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 786 (2d Cir. 1999).

Defendant has, without question, transacted significant business within New York, both in his personal and corporate capacities, including in connection with Taylor-Serrano—the final result of which motivated Defendant to make the defamatory statements at issue. Defendant was personally involved in negotiations toward the Agreement, which was for "the professional boxing services of Amanda Serrano" to be provided by Defendant's company, MVP, in New York and in this District, in addition to being governed by New York law and requiring the parties to consent to the jurisdiction of New York courts. [Doc. 17-2] The Agreement also obligated Defendant to personally fulfill a number of contractual obligations, and Defendant did in fact fulfill those contractual obligations, including personally attending a launch press conference for the fight at MSG in February 2022; participating in all fight-week promotional activities in New York, such as media activities, another press conference at MSG, and weigh-ins; and ultimately, Defendant being physically present, and seated next to Hearn, at Taylor-Serrano in April 2022. The above is in addition to Defendant's other business contacts with New York, which include previously opening a pop-up shop, and entering into contracts and engaging in press activities within New York for two of his own boxing matches, both of which were cancelled, but were contracted to be held at MSG in August 2022.

As detailed above, Plaintiffs' causes of action against Defendant are premised on Defendant's defamatory statements accusing Plaintiffs of bribery and corruption in connection with Usyk-Joshua and Taylor-Serrano, and Defendant's statements alone, *i.e.*, "I still believe Amanda Serrano won the fight," make it clear that his comments regarding both fights were directly tied to his business transactions in New York. Therefore, this Court has personal jurisdiction over Defendant.

**<u>Matchroom is Not Barred from Maintaining This Action</u>**

Defendant relies on New York Business Corporation Law ("NY B.C.L.") §§ 1301 and 1312(a) for the proposition that Matchroom "cannot sue in this Court" because, Defendant contends, Matchroom is a foreign corporation "'doing business' in New York within the meaning of" § 1312(a) without authorization. *See* Letter, at 3. This ignores established New York law, and contradicts uncontroverted facts revealed during jurisdictional discovery in this matter.

Courts approach this issue on "a case-by-case basis with inquiry made into the type of business being conducted," and a defendant seeking to bar a plaintiff's lawsuit under § 1312 has the burden of proving that the foreign corporation's business in New York is "so systematic and regular as to manifest continuity of activity in the jurisdiction." *See Highfill Inc. v. Bruce and Iris, Inc.*, 50 A.D.3d 742, 743-44 (2nd Dept. 2008). For a foreign corporation to be deemed to be doing business



in New York, "the intrastate activity of a foreign corporation [must] be permanent, continuous, and regular." *Netherlands Shipmortgage Corp. v. Madias*, 717 F.2d 731, 736 (2d Cir. 1983). As jurisdictional discovery in this matter revealed, Matchroom does not engage in intrastate business activity in New York, much less engage in permanent, continuous, and regular intrastate activity.

"The purpose of the statute is to put foreign corporations on equal footing with domestic corporations," and "the policy behind § 1312" is not "frustrated," where the plaintiff-foreign corporation "has established a separate New York corporation for the purpose of conducting its New York activities that pays fees and taxes in New York." *Storwal Int'l, Inc. v. Thom Rock Realty Co.*, L.P., 784 F. Supp. 1141, 1145 (S.D.N.Y. 1992) (rejecting the proposition that a foreign parent corporation may be deemed "doing business in New York through the activities of its New York subsidiary"); *see Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc.*, 46 F. Supp. 3d 255 (S.D.N.Y. 2014), *rev'd on other grounds on reconsideration*, No. 12 CIV. 5423 LAP, 2015 WL 150756 (S.D.N.Y. Jan. 12, 2015) ("Foreign corporation not deemed to be doing business in New York through conduct of its wholly-owned subsidiary, which [had] full authorization, and thus state's door closing statute did not apply to bar corporation from maintaining any action…in state, as subsidiary's activities had no bearing on statute's applicability to corporation.").

Here, Matchroom's subsidiary, MBUSA—the entity that contracted with MVP in connection with Taylor-Serrano—is unquestionably authorized to conduct business in New York. As Palmer testified, "promotion," in the boxing sense, "it's a very general term," and "you do not require a promotional license to promote an event in the broader sense." And, with regard to Taylor-Serrano, "[t]he Matchroom Boxing Group promoted that event because one of its boxers appeared on it," however, MBUSA "was the licensed promotional entity, and complied with all requirements…to make sure it was licensed appropriately."

While Matchroom is tangentially involved in business in New York, as it promotes events "in the broader sense," the only entity in the Matchroom Group that does business in New York, as defined by § 1312, is Matchroom's subsidiary MBUSA, which is fully authorized to do so. Matchroom "does not maintain a bank account, own real property, maintain an inventory of securities, or an office for the purpose of transacting business" in New York. *See Colonial Mortg. Co. v. First Fed. Sav. & Loan Ass'n of Rochester,* 57 A.D.2d 1046 (4th Dept. 1977) (finding that the plaintiff-foreign corporation was not doing business in New York). Thus, Defendant here, like the defendant in *Storwal*, "has failed to demonstrate how the purposes of § 1312 would be furthered by also having [Matchroom] register as doing business in New York." *Storwal*, at 1145. Because Matchroom is not doing business in New York, except through the activities of its subsidiary, MBUSA, it is not precluded from maintaining this lawsuit. *See* NY B.C.L. §§ 1301, 1312.

                                               Respectfully submitted,

                                               /Frank Salzano/

                                               Frank Salzano, Esq.

cc: All Counsel of Record (via ECF)

